1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

COLLEEN WARNESS,

CASE NO. C09-1098JLR

11

Plaintiff,

ORDER GRANTING MOTIONS
FOR SUMMARY JUDGMENT

12

v.

13

CITY OF SNOHOMISH, et al.,

14

Defendants.

15

**I.    INTRODUCTION**

16

This matter comes before the court on Defendant City of Snohomish's ("the City")

17

motion for summary judgment (Dkt. # 14), and Defendants Corey and Krista Cook's

18

motion for summary judgment (Dkt. # 19).  Having reviewed the motions, as well as all

19

papers filed in support and opposition, the court GRANTS the City's motion for

20

summary judgment (Dkt. # 14), and GRANTS Corey and Krista Cook's motion for

21

summary judgment (Dkt. # 19).

22

# II.   BACKGROUND

On April 9, 2008, Corey Cook ("Officer Cook"), a police officer for the Snohomish Police Department ("SPD") assigned to traffic patrol duty on the SPD's only motorcycle, stopped Plaintiff Colleen Warness, a resident of Snohomish, and issued her a citation for running a stop sign.  (Freeman Decl. (Dkt. # 15) ("Warness Dep.") at 95-96, 98-101.)  During the stop, Ms. Warness told Officer Cook about suspected drug activity in her neighborhood and encouraged him to "drive by and take a look at it."  (*Id.* at 101-02.)  The following week, Ms. Warness was again pulled over by Officer Cook, this time for speeding.  (*Id.* at 108.)  When she told him she still had the ticket from the previous week, Officer Cook laughed and let her off with a warning to "[s]low down."  (*Id.* at 109.)  During this second stop, Ms. Warness may have mentioned again to Officer Cook that she suspected drug activity on her street.  (*Id.* at 110.)  Some time later, Ms. Warness suggested that her neighbor, Ann Gilbert, also ask Officer Cook to come to the neighborhood to investigate the suspected drug dealing.  (*Id.* at 118.)

Within the next week, Officer Cook stopped by Ms. Warness' house to follow up on her concerns about drug activity in her neighborhood.  (*Id.* at 113-14.)  Ms. Warness let Officer Cook into her home, described the activity she had observed, and showed him the view of the activity she had from her windows.  (*Id.* at 119.)  Several days later, Officer Cook stopped by Ms. Warness' house again.  (*Id.* at 123-24.)  In addition to discussing the drug activity, Officer Cook and Ms. Warness also discussed their work, their families, and people they knew in common.  (*Id.* at 124-25.)

1    Contact between Officer Cook and Ms. Warness continued over the next several

2   weeks.  During that period, Officer Cook stopped by Ms. Warness' house "over a dozen

3   times."  (*Id.* at 128.)  According to Ms. Warness, Officer Cook was always dressed in full

4   police uniform and appeared to be on duty during these visits.  (Warness Decl. (Dkt. #

5   24) ¶ 4.)  During one visit, Ann Gilbert, her daughter, and Ms. Warness showed Officer

6   Cook a video they had taken of the alleged drug dealing in their neighborhood.  (Warness

7   Dep. at 147.)  After Ms. Gilbert and her daughter left, Officer Cook stayed and talked to

8   Ms. Warness about motorcycles.  (*Id.* at 149.)  When Ms. Warness mentioned her age,

9   Officer Cook told her "you certainly don't look 48 years old.  You're very attractive."

10   (*Id.* at 150.)  Before leaving, he also gave Ms. Warness his business card containing his

11   work and his cell phone numbers.  (*Id.*)   Another time, Officer Cook stopped by the

12   suspected drug house on Ms. Warness' street, telling one of the occupants that he knew

13   what they were doing and that they better quit or they would have to deal with him.  (*Id.*

14   at 137.)

15    On several visits, Officer Cook made comments that Ms. Warness felt were

16   "probably not appropriate" (*id.* at 136), such as describing traffic stops he had made

17   where woman attempted to expose body parts to get out of tickets and describing a

18   skimpy outfit worn by one of the occupants of the suspected drug house (*id.* at 136-37).

19    At some point, Ms. Warness developed a concern that the contacts between herself

20   and Officer Cook were becoming personal rather than professional.  (*Id.* at 264.)  Twice,

21   Ms. Warness did not answer the door because she did not feel like talking to Officer

22   Cook, and he went away.  (*Id.* at 152-53.)  Another time, she told him that she could not

1    talk because she was busy and he left.  (*Id.* at 151-52.)  According to Ms. Warness, she

2    never asked Officer Cook to stop coming by her house because she was intimidated by

3    the fact that he was a police officer.  (Warness Decl. ¶ 8.)

4         Then, on June 20, 2008, Officer Cook called Ms. Warness several times.

5    (Warness Dep. at 154-57.)  During one of the initial calls, Officer Cook told Ms. Warness

6    that he had the day off and was calling to see what she was up to.  (*Id.* at 155; Freeman

7    Decl. ("Warness Citizen Compl.") at 50.)  Ms. Warness, who was running errands at the

8    time, deflected his call, telling him that she was busy and had to go.  (Warness Dep. at

9    155.)  When Officer Cook called back, he told Ms. Warness that his wife was out of

10   town, his kids were gone, and that he was in the garage drinking beer.  (*Id.* at 155, 158.)

11   Ms. Warness told him that she was "in the car with kids and was unable to have this

12   conversation with him," and that she was leaving for Wyoming the following day.  (*Id.* at

13   155-56; Warness Citizen Compl. at 50.)  Officer Cook offered to help her "pack [her]

14   drawers" and Ms. Warness told him she did not want him to come to her home.

15   (Warness Decl. ¶ 10.)  According to Ms. Warness, Officer Cook sounded like he was

16   becoming intoxicated as the calls progressed (Warness Dep. at 159) and on several

17   occasions, Ms. Warness did not answer Officer Cook's calls (*id.* at 156).

18        Later that afternoon, Officer Cook again called Ms. Warness and told her he

19   wanted to come over, stating "I'm not going to give up until you give in.  How about a

20   pizza?  I'll bring a pizza.  I'll bring some beer.  What kind of beer do you like?  What

21   kind of pizza do you like?  How about a movie?  How about Debbie Does Dallas?"  (*Id.*

22   at 156-57.)  Ms. Warness told Officer Cook she was not interested and that if he came by

1   she would not be there.  (*Id.*)  Officer Cook told her that "I don't want you to hate me

2   because I want to cheat on my wife with you."  (*Id.* at 157.)  Again, Ms. Warness told

3   him that she was not interested, that she would not be at home if he came by, and asked

4   him if he was going to harass her now because she was declining his advances.  (*Id.*)  He

5   told her no (Warness Citizen Compl. at 51), but stated that he "still give[s] good looking

6   women tickets" (Warness Dep. at 157).  Officer Cook made a final call to Ms. Warness

7   that evening but she did not answer.  (*Id.* at 160.)  Ms. Warness stayed the night at her

8   fiancé's house and does not know whether Officer Cook ever came by her home that

9   evening.  (*Id.* at 159-60.)

10          On June 25, 2008, Ms. Warness filed a citizen complaint with the SPD, claiming

11   that Officer Cook's actions of June 20, 2008, made her "uneasy and fearful."  (Turner

12   Decl. (Dkt. # 16) ¶¶ 5-6.)  Two days later, the Snohomish County Superior Court issued a

13   temporary protective order against Officer Cook.  (*Id.* ¶ 11.)  At the request of the SPD,

14   the Everett Police Department conducted an internal investigation regarding Ms.

15   Warness' allegations against Officer Cook, finding that Officer Cook violated the SPD's

16   General Orders as to Unbecoming Conduct, Use of Alcohol Off-Duty, Truthfulness, and

17   Ethics.  (*Id.* ¶¶ 9, 15.)  And, on September 12, 2008, SPD Chief of Police John Turner

18   recommended terminating Cook's employment.  (*Id.* (Turner Recommendation Letter) at

19   61-62.)  Officer Cook subsequently resigned from the SPD on September 30, 2008.  (*Id.*

20   (Cook Resignation Letter) at 63.)

21          On August 3, 2009, Ms. Warness filed this lawsuit against the City of Snohomish

22   and Officer Cook.  In her complaint, Ms. Warness asserts two causes of action for: (1)

ORDER- 5

1   violation of constitutional rights under 42 U.S.C. § 1983[1] and (2) tortious conduct under

2   the principles of *respondeat superior* and negligent supervision.  (Compl. (Dkt. # 1) ¶¶

3   14-20.)

4                           **III.    ANALYSIS**

5          The City and Officer Cook now move for summary judgment on Ms. Warness' 42

6   U.S.C. § 1983 claims on the grounds that (1) Officer Cook was not acting under color of

7   law when he called Ms. Warness on June 20, 2008 (Cook Mot. at 6; City Mot. at 11); (2)

8   Officer Cook did not violate Ms. Warness' constitutional rights (Cook Mot. at 12; City

9   Mot. at 11); and (3) Officer Cook did not act under any policy, practice, or custom of the

10  City (City Mot. at 11).  The City and Officer Cook also move for summary judgment on

11  Ms. Warness' tortious conduct claims on the grounds that Ms. Warness fails to establish

12  that Officer Cook or the City breached a legal standard of care.  (Cook Mot. at 17; City

13  Mot. at 17).

14  **A.     Governing Law**

15          **1.     Summary Judgment Standard**

16          Summary judgment is appropriate "if the pleadings, the discovery and disclosure

17  materials on file, and any affidavits show that there is no genuine issue as to any material

18  _____

19          [1] In her complaint, Ms. Warness also claims that Officer Cook and the City violated her
    rights under Article 1, Section 7 of the Washington State Constitution.  (Compl. ¶ 14; *see also*
20  Freeman Decl. (Cook Interrogatories) at 113.)  However, "Washington courts have consistently
    rejected invitations to establish a cause of action for damages based upon constitutional
21  violations without the aid of augmentative legislation."  *Blinka v. Washington State Bar Ass'n*,
    36 P.3d 1094, 1101 (Wash. Ct. App. 2001).  Moreover, Ms. Warness failed to address this issue
22  in her response.  Therefore, the court concludes that Ms. Warness has no claims against Officer
    Cook or the City under the Washington State Constitution.

1   fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c);

2   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477

3   F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing that

4   there is no material factual dispute and that he or she is entitled to prevail as a matter of

5   law.  *Celotex*, 477 U.S. at 323.  If the moving party meets this burden, the nonmoving

6   party must go beyond the pleadings and identify specific facts which show a genuine

7   issue for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229

8   (9th Cir. 2000).

9       **2.    42 U.S.C. § 1983**

10      The purpose of § 1983 is to deter state actors from using the badge of their

11   authority to deprive individuals of their federally guaranteed rights.  *See Wyatt v. Cole*,

12   504 U.S. 158, 161 (1992).  To state a claim under § 1983, a plaintiff must prove that a

13   defendant, while acting under the color of law, deprived him or her of the rights secured

14   by the Constitution or laws of the United States.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

15   In addition to state officials, municipal entities are also subject to § 1983 liability, *Collins*

16   *v. San Diego*, 841 F.2d 337, 340-41 (9th Cir. 1988); however, a municipality is subject to

17   liability under § 1983 only when the violation of the plaintiff's federally protected right

18   can be attributable to the enforcement of a municipal "policy" or "custom."  *Id.* at 341

19   (citing *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).

20

21

22

1  **B.      The City's and Officer Cook's Liability Under § 1983**

2          **1.      Color of Law**

3          Whether Officer Cook was acting under color of law is a close issue.  A police

4  officer's actions are under color of law only if they are "in some way related 'to the

5  performance of his or her official duties.'"  *Van Ort v. Estate of Stanewich*, 92 F.3d 831,

6  838 (9th Cir. 1996) (quoting *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)).  "By

7  contrast, an officer who is pursuing his [or her] own goals and [i]s not in any way subject

8  to control by his [public employer] does not act under color of law, unless he or she

9  purport[s] or pretend[s] to do so."  *Huffman v. County of Los Angeles*, 147 F.3d 1054,

10  1058 (9th Cir. 1998) (internal citations omitted).

11          Here, while it is undisputed that Officer Cook was off duty when he called Ms.

12  Warness on June 20, 2008, all prior contact between Officer Cook and Ms. Warness

13  occurred while Officer Cook was in uniform, apparently on duty (Warness Decl. ¶ 7);

14  and, after Ms. Warness told Officer Cook she was not interested in his advances, Officer

15  Cook mentioned that he "still give[s] good looking women tickets" (Warness Dep. at

16  157).  Based on this reference to official police activity—issuing traffic tickets—as a

17  possible repercussion of Ms. Warness snubbing his advances, it is likely that Officer

18  Cook was acting under color of law when he called Ms. Warness.  However, resolution of

19  this issue is unnecessary as the court concludes that Ms. Warness' § 1983 claims against

20  the City and Officer Cook fail to demonstrate the existence of a constitutional violation.

21

22

2.      **Fourth Amendment**

Ms. Warness claims that Officer Cook violated her Fourth Amendment rights by "going to, and entering, her home and by obtaining, and then calling, her mobile telephone number." (Resp. (Dkt. # 22) at 23.) While Officer Cook's conduct constitutes poor judgment, it does not reach the level of a Fourth Amendment violation.

The Fourth Amendment prohibits unreasonable and unauthorized searches and seizures by the government. *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016 (9th Cir. 2008). However, a "Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (quoting *California v. Ciraolo*, 476 U.S. 207, 211(1986)).

Here, Ms. Warness did not manifest a subjective expectation of privacy in either her house or her telephone number with regard to Officer Cook. On his first visit to her house, Ms. Warness invited Officer Cook inside to discuss the alleged drug activity in her neighborhood and to show Officer Cook the view from her windows. (Warness Dep. at 119.) And, throughout the period of contact between Officer Cook and Ms. Warness, during which Officer Cook visited Ms. Warness "over a dozen times" (*id.* at 128), Ms. Warness never told Officer Cook that he was unwelcome in her home (*id.* at 265).

Claiming a lack of consent, Ms. Warness argues that Officer Cook "gained access to her home and her mobile number under the pretext of performing official duties" (Resp. at 23), contrary to the established principle that a police officer cannot obtain entry "by misrepresenting the scope, nature, or purpose" of his investigation. *United States v.*

1    *Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993) (citing *United States v. Bosse*, 898 F.2d 113,

2    115 (9th Cir. 1990)).  This argument, however, is based on the subjective mindset of

3    Officer Cook and is unsupported by the record.  And, unlike the cases Ms. Warness cites

4    for this argument, Officer Cook did not create a false identity to gain entry into her home,

5    *see Bosse*, 898 F.2d at 115, or lie about the purpose of his visit in order to arrest Ms.

6    Warness, *see United States v. Phillips*, 497 F.2d 1131, 1134-35 (9th Cir.1974).  Thus, the

7    court concludes that Officer Cook did not misrepresent the scope, nature, or purpose of

8    his investigation under the relevant Ninth Circuit case law.

9          Moreover, Officer Cook did not obtain Ms. Warness' telephone number through

10   an illegal search.[2]  Rather, Ms. Warness gave Officer Cook her phone number, without

11   being solicited, when, sometime in May, she brought him a list of license plates of cars

12   she had seen stop at the alleged drug house in her neighborhood.  (Warness Dep. at 117,

13   143; Freeman Decl. at 53-61.)  Finally, regarding Officer Cook's June 20, 2008 calls to

14   Ms. Warness, Ms. Warness can cite no authority establishing that a telephone call

15   constitutes a search or seizure.  Rather, Ms. Warness had control over whether to answer

16   Officer Cook's telephone calls and control over whether to continue or terminate each

17

18

19
         [2] Ms. Warness assert that Officer Cook obtained her phone number during one of his trips
20   to her home.  (Resp. at 6 n.3; *see also* Warness Decl. ¶ 9.)  She does not assert, however, that he
     obtained the number illegally.  Moreover, this assertion directly conflicts with her prior sworn
21   testimony that she gave Officer Cook her phone numbers.  (Warness Dep. at 117, 143.)  Because
     affidavits contradicting prior depositions cannot be used to create an issue of material fact, *see*
22   *Block v. City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001), the court disregards Ms.
     Warness' assertion.

1   individual call.  The court concludes, therefore, that the telephone calls do not constitute

2   a search in violation of the Fourth Amendment.

3        In repeatedly consenting to Officer Cook's visits, Ms. Warness failed to manifest a

4   subjective expectation of privacy in her house; accordingly, no search occurred as a result

5   of Officer Cook's "going to, and entering, her home."  Moreover, because Ms. Warness

6   voluntarily gave Officer Cook her telephone number, Officer Cook did not obtain the

7   telephone number as a result of an illegal search and the number was not seized in

8   violation of the Fourth Amendment.  Thus, while Officer Cook's behavior may have been

9   unprofessional and ill-advised, it did not constitute a constitutional violation.

10       Absent a deprivation of Ms. Warness' Fourth Amendment rights, the court

11  concludes that Ms. Warness has no § 1983 claim against either the City or Officer Cook.

12  **C.    The City's and Officer Cook's Liability for Tortious Conduct**

13       The court turns next to Ms. Warness' state law claims.  In order for the City to be

14  liable for tortious conduct under either the principle of *respondeat superior* or the

15  principle of negligent supervision, Ms. Warness must first establish the existence of a

16  state law claim against Officer Cook.  Because Ms. Warness fails to do so, Ms. Warness'

17  tortious conduct claims against both Officer Cook and the City cannot survive the

18  motions for summary judgment.

19       Under Washington law, an employer is responsible for the torts of its employees

20  done in the scope and course of employment.  *Smith v. Sacred Heart*, 184 P.3d 646, 647

21  (Wash. Ct. App. 2008).  An employer is also responsible for the torts committed by an

22  employee, even if outside the course and scope of employment, if the employer was

ORDER- 11

1  negligent in failing to properly supervise the employee or in failing to protect those

2  particularly vulnerable from foreseeable harm.  *Id.* at 647-48.  Both *respondeat superior*

3  and negligent supervision claims are contingent on the existence of state law claims

4  against a defendant's employee.

5       Here, Ms. Warness fails, both in her complaint and her response, to identify any

6  specific state law claim against Officer Cook.  Instead, in her response, Ms. Warness

7  states that "Defendant Cook's conduct was clearly unwanted, inappropriate, and illegal,"

8  and that "Defendant Cook had a duty to refrain from abusing his official position and

9  public trust."  (Resp. at 29.)  These conclusory statements do not establish that Officer

10 Cook breached any legal standard of care that would warrant recovery against Officer

11 Cook, or against the City through *respondeat superior* or negligent supervision.  Absent

12 evidence that Officer Cook breached a legal standard of care in his conduct with Ms.

13 Warness, the court concludes that Ms. Warness has no claim against either Officer Cook

14 or the City for tortious conduct under Washington law.

15                    **IV.    CONCLUSION**

16      For the foregoing reasons, the court GRANTS the City's motion for summary

17 judgment (Dkt. # 14), and GRANTS Corey and Krista Cook's motion for summary

18 judgment (Dkt. # 19).

19

20

21

22

1    Dated this 19th day of July, 2010.

2

3

4    _____
     JAMES L. ROBART
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 13